Case number 21-4123, Erica Bojicic et al. versus Richard DeWine et al. Oral argument is not to exceed 20 minutes per side. Mr. Renz for the appellants. You may proceed. Your honors, thank you very much for the opportunity to address this court. The question we have before the court today is actually quite narrow, though fairly complex. The question is simply this. Do my plaintiffs, my clients, have the opportunity when bad faith and injury are alleged to have a legal right to discovery, to plead their case, to brief the court on issues of fact and law when state and municipal actors are involved in what we allege to be arbitrary and capricious and or bad faith actions? It's a very narrow thing and it's very easy, I think, to get lost in the minutia of this case because there are so many complex issues which we look forward to fully briefing everybody on. We start out with standing. We didn't need a concrete and particularized injury. Our plaintiffs were shut down. We believe that they were shut down in an arbitrary and capricious manner. We've alleged that. We believe that they were denied the right to work as an entire class of employment type job categories were shut down. Dance studios as a generalized class of instruction. And we believe that this was all done without the proper due process. There was no political... Why were they, I mean, whose order shut them down? They were shut down by the orders of Governor Mike DeWine's health department which were implemented on a county-by-county basis. It was very unclear how exactly those orders promulgated down, who was responsible for what. The orders were exceedingly vague. So that's one of the issues is that it's very difficult to show precisely where one hand ended and the other started because without discovery, we don't have access to the internal documents. How much of this was specifically the issue of a local? I thought there was an order by the state health director, Amy Acker. Yes. Yes, Your Honor, there was. Some defendants implemented that fairly verbatim. Some seemed to do extra. But didn't that order say there shall be a shutdown? Isn't that the crux of your problem? Yes, the crux of our problem is that there was a shutdown that we believe and allege was done in an arbitrary, capricious manner and in bad faith. And that did come originally from the state health department. But whether or not, you know, the individual health departments had a hand in that or how much of a hand they had, we don't know yet. So... Do you need to know that? Absolutely, Your Honor. Absolutely. And I'm sorry to interrupt. No, I'm just thinking if the state health director, Acton, issued the order and the order applied across the state, shouldn't we just get to the merits of the claims that you have? Well, it would be wonderful to get to the merits, but we haven't had the discovery or the opportunity to even brief on those merits yet, really. I mean, at this point, we're just asking to have the opportunity to fully brief the lower court on what's going on. Don't you have to have a valid claim under 12B6? Absolutely. Which normally would not need discovery on a 12B6 motion. Well, but we believe that we did have a valid claim. So we have an interesting situation here. For the first time in American history, entire classifications of jobs were shut down. An entire state was locked down. I would say from a legal perspective, this is one of the most momentous occasions in American history. I couldn't point to another situation in history, and I've looked extensively. There's some interesting things that happened in World War II and around the Great Depression era, but I couldn't point to another situation like this. And that kind of goes to the core of what we're doing here. We're saying, Your Honor, we aren't asking for you to give us a victory in the case. We're asking us to be able to bring this case forth in a full way and, you know, if it's summary judgment, we haven't been able to substantiate our claims of arbitrary and capriciousness. If we haven't been able to substantiate our claims that there is a valid reason here, then a summary judgment motion may be, you know, applicable. But at this point, we haven't been able to do that. And further, Your Honor, in the Northern District, we were admonished very severely and very publicly for filing too much in a complaint. We referenced that in our brief. That was in a different case. It was in a different case, and then again in a separate case. So there were two cases that we filed. The first case, we were admonished very severely. That case was, the complaint itself was, I think, in 40 to 60 pages-ish, but we attach and cited every piece of evidence that we were referring to in there, and the attachments ended up in total being probably in the 650 to 750-page range. The Honorable Judge Carr informed us that he was suffering from macular degeneration and it was difficult for him to look at these things, which is fine. So we, as a courtesy to him, and based on our understanding of what the court was looking for, we tried to keep this very brief. We also, in another case with Judge Knapp in the same court, were told, because we had filed another case and that complaint was in the 60 to 70-page range, and he said, we want this in the 20 to 30-page range. We were told, keep it brief. I would love to give you guys thousands of pages to support every fact we've alleged, but we were told, keep it brief, and we were told to keep to the notice pleading requirements. That was in a different case, right? It was. We're only dealing with this case. It was. There was an error by the judge in another case. It was your responsibility to appeal that other case. Well, for reasons that we can't go into because of privilege, we're not able to explain why our client chose not to do that, but we were not able to in that case. We have appealed the other. We're only dealing with this case, and if the judge made a mistake in another case, so be it. Here, I mean, this is a 1983 action, right? It's a 1983, and then I think on the takings claim, I think there's kind of two parallel analyses that occur. There's the 83 claim, and then I think it's the law seems to me to be a bit muddled on Fifth Amendment claims, whether they're fully 83 or whether they're an enumerated claim. The law is pretty well settled that when you sue a defendant in 1983, you have to have specific allegations as to that defendant. Yes, Your Honor. The problem here is you have so many defendants, and I don't see the specificity as to each defendant. We have to analyze them one by one. Agreed, Your Honor. You just can't throw everybody in there. Agreed. Well, we'll figure it out later. People don't have to be sued to figure it out later. You have to have a plausible allegations against each 1983 defendant, and I think that was the basis for the dismissal here, and why is that improper? Well, it's improper because we did. Listen, Your Honor, it speaks for itself. Clearly, nobody's disputed that these orders were out there, that our clients were shut down. Nobody's disputing them. They were there. We allege that. Each party involved was in some way responsible for those orders. In some way. They need to know how, or we need to know how. We do, which is why. They would be, or they might be. It has to be plausibly alleged. Well, we did plausibly allege because, Your Honor, we discussed that the orders were issued through Acton and then posted on websites or implemented through each. Did you specify what orders you're talking about? Did we specify? Yeah, the orders closing down the businesses. I know, but did you identify them? That is, there were orders on the 20th, the 21st, the 22nd of March, and then in May. Did Acton issue all of those orders? Yes. Those orders were from Acton, I believe, and then the different jurisdictions, the different municipalities, which, by the way, under Monell, are not immune from an 83 action under state sovereignty, implemented them. If we go back to what you did file, are those identified as specifically the orders involved and that Defendant Acton was the one who issued them? I believe they were. I'd have to double check the exact language of the complaint, but yeah. That's important. All right, we can check that. Thank you. Go ahead. My understanding of the district judge's resolution of this was that, among other things, he said that you failed to state a claim under 12B6 for your various allegations in the complaint. Yes, ma'am. So taking an example, your second claim for relief is violation of equal protection. Don't you have to identify how in the complaint you think your equal protection rights were violated? Well, we did. We allege in the very, very short amount of page length that we had available to us. You had available? Did the judge impose a page limitation on your complaint? I don't know how much more clear he could have been in our previous dealings with him. In this case, you were not under a page limitation in the complaint, were you? Well, Your Honor, would it be proper if I come before you? Just answer my question. No. Okay, you weren't. Okay, thank you. Not to my knowledge, other than the one that was previously suggested. My understanding from the previous conversations with the judge was this is what he wants. Did you allege in your complaint that you were treated differently than others similarly situated? Yes, we did, Your Honor. In what way did you do so? That is, who is your comparator? Equal protection places, religion, we have the churches against the casinos, or the grocery stores against the nail salons. What was your comparator in the complaint? How was it alleged? We talked about the fact that in our case, our dance studios were shut down versus other large box stores and places where more people were gathered in a single spot and other such places. But there's an obvious difference in that dance studios are places where people are exercising and are breathing heavily. With COVID being a disease that's transported by breathing in close proximity, there seems to be a difference between dance studios and big box stores where people walk in a big store. I'm very glad you brought that up, Your Honor. Very glad. Because that illustrates 12B6 requires plausibility. Right? I mean, we've got the plausibility standard. What you just said was regurgitation of facts, quote unquote, from our opponents. We disagree with that. In fact, I have an expert who's testified in numerous cases around the country that one of the greatest risks related to the spread of COVID is whether the air is moving. It's not so much where you're at or proximity, but whether the air is moving. We have all sorts of arguments to make on that. But we didn't even get the opportunity to present that to the court. What if, Your Honor? So you're saying now you're telling us that it's arbitrary and capricious, et cetera, because your air is moving in a different way than somebody else's. We're telling you it's arbitrary and capricious. But that would seem to be something that ought to be in the complaint, would it not? To just say we're treated differently, period. Your Honor, we were admonished and told that we were going to get a show cause order, no matter why we should not be. I mean, we were concerned about being two judges in the same court. It seems like a court rule to us. I mean, I guess I can't say before this tribunal that I was ordered. But I can tell you that two judges in two separate cases in multiple instances made it very clear that they did not want lengthy filings. They couldn't have been more crystal clear. We did cite to that. And, you know, ultimately when we talk about the science, it is not our job prior to any discovery, I do not believe, to accept the fact finding of the other side. I mean, we've alleged that it was arbitrary and capricious. We've alleged that what they've done was in bad faith. We've alleged that things like case counts and other things were inflated. All we're asking for is in the situation where one of the most controversial issues in our nation's history is forcing the shutdown of businesses. We're just asking for the opportunity to demonstrate to you the fullness of the case. We're not even asking to get our constitutionally authorized adversarial approach at. That's trial. We're just looking, hey, it looks like equal discovery. It looks like a takings. Here's what it is. We've pled it with enough specificity. Your red light has been on, I'm afraid. Oh, thank you, Your Honor. It's hard for us to hear from the other side, but thank you. Thank you. Good afternoon. May it please the court, my name is Catherine Bachbreder. I represent Ohio Governor Mike DeWine and the other state defendants in this case. The plaintiffs made a meritless attempt to challenge the orders that the Ohio Department of Health issued to limit the spread of COVID-19. And before a plaintiff gets the right to discovery, they have to properly invoke the jurisdiction of the court and properly plead a claim. And the district court correctly found that the plaintiffs did not do this. The claims against the plaintiffs failed to meet the most basic Rule 8 pleading requirements. And the claims against the state, they tried to sue the state itself, which is not permitted in federal court. And the claims against the defendants in their official capacities are also barred by the 11th Amendment. Okay, well, let's cut to what might be their best claim, which seems to me, at least, and the colleagues would be against Ms. Acton, who's the state health director, who did issue orders that had the effect of closing down their businesses, among many others. So at this point, what's deficient about their claim against her? And in your view, what would it have taken to cure that? Well, under the pleading rules, if that's what you're referring to, they did not identify the exact orders. So you're talking now Rule 8? Yes, Rule 8. They did not identify the orders that were issued. One of the defendants attached orders that they thought the plaintiffs were referring to, and the court said, I'm going to, this seems to be what they're talking about, and I'll take that for what it's worth. But they didn't identify that themselves. And the court did find that, to the extent those were the orders that issued, there was sufficient traceability to Amy Acton, but to no other defendant, no other state or local defendant. But looking at the complaint vis-a-vis Amy Acton, why isn't it sufficient? Because they made bare legal conclusions without any supporting facts, and there's also jurisdictional issues with respect to 11th Amendment immunity and qualified immunity. All the claims the plaintiffs brought seek only non-prospective relief. They ask for compensatory damages. They ask for a declaratory judgment for past conduct. All those claims against the defendants in their official capacities are barred by the 11th Amendment. And then the claims against the defendants in their personal capacities, those defendants are entitled to qualified immunity, and plaintiffs haven't alleged facts showing a violation of a clearly established constitutional right. The law at the time, the primary authority at the time these orders were issued, was the Jacobson v. Massachusetts case by the Supreme Court. And that case gave very broad authority and discretion to states to issue public health orders in a public health emergency. So that is the legal... Although Jacobson was a $5 fine as opposed to having your business shut down. That was because it was a vaccine requirement for individual people. Well, but it's a $5 fine if you didn't do it. A $5 fine 100 years ago. Well, even so, that is here if they had not shut down, presumably they would have sent the sheriff after them. Right. You don't know, but that would have been the import of it. So looking at... But if you look at the time, the law said at that time that they had broad authority to do that and great discretion to do that. And so they are entitled to qualified immunity. But the claims that they allege, it's not just that they were short or brief or insufficient. They're contrary to law. They don't state the accurate levels of review for each claim. For example, they bring a... You don't state the accurate what? The accurate or the applicable level of review. Level of review. Standard of review. The standard of review. I'm sorry. The substantive due process claim, they allege a fundamental right to work. And they allege that it should be subject to strict scrutiny. That's not an accurate description of the law. The Supreme Court and this court have both held that right to work claims such as those are subject to only rational basis review. Does the complaint have to say what standard of review applies to a claim? I guess I shouldn't say that. It doesn't have to state that. But their claims don't meet. They don't... Even giving all their claims, you know, accepting them as true, they make bare legal conclusions that aren't supported by the facts. And both of their claims, the due process claim and the equal protection claim, are both subject to rational basis review. And the Roman Catholic Diocese versus Cuomo case, the Supreme Court held that the state has not only a legitimate interest, but a compelling interest in addressing COVID-19. So the only question is, are these restrictions rationally related to that goal? And plaintiffs challenge the effectiveness, the risk that's associated with COVID-19 and the effectiveness of the restrictions. But under rational basis review, a court does not look at that. The state does not have to be scientifically supported or effective. It's only necessary that it's plausible, that it might be thought that the measure is a rational way to address the problem. Speculation is sufficient. It doesn't matter if the state's mistaken. It doesn't matter if they brought experts in to show that perhaps there would have been a better way to do this or they shouldn't have had shutdowns or they shouldn't have had mask requirements. If it was plausible, if it was reasonable for the state to think that, then it passes rational basis review. And this court in the France case has already held that the mask requirements do meet rational basis review and don't violate due process. And other courts, the Slidewater courts held that business closures, very similar to these, satisfy rational basis review because this is a disease that transmits from person to person. So therefore, if you restrict businesses, you are preventing people from gathering those places, you are lessening the contacts. That rationally relates to preventing the spread of a transmissional disease or a contagious disease. Similarly, on the equal protection claim, they don't allege any of the required elements or facts meeting the required elements of the claims. They don't identify similarly situated parties. They merely say that their businesses were treated differently than other businesses, but they don't identify what types of businesses. But more importantly, a business is not a suspect class. So again, we're talking about rational basis review as this court held in the League of Independent Fitness Facilities. In the brief, they compare their business to grocery stores, gas stations, and medical and dental providers. Those are not similarly situated, as you indicated, Your Honor. Dance studios involve strenuous physical activity where people are breathing heavily and plaintiffs concede that it's difficult to maintain social distancing in a dance studio when they're engaged in those activities. What about your opponent's point here that there is information, according to him, that it has to do largely to airflow in a particular place? And under rational basis review, that does not matter. It only matters if the state had a plausible, rational basis to think that that might be appropriate. And this court has already held in the League of Independent Fitness Facilities, which dealt with gyms, another place where there is strenuous physical activity and people are sweating and breathing heavily, that that meets rational basis review for equal protection. There are rational reasons to treat that type of business different than other businesses. In addition to the fact that he's comparing himself to their businesses, to food, medical care, those are things that people cannot live without. People need food. People need medical care. They need gas to transport themselves to obtain those necessary services. So these are circumstances that the state could legitimately find that those were likely to spread the virus and they can treat those differently under rational basis review. How about the claim that it's a taking without just compensation? The district court also correctly found that that failed to state a claim and doesn't allege facts violating a clearly established constitutional right that would be required to defeat qualified immunity. There's not a physical taking here. They allege the bare legal conclusion that there is a complete deprivation of use, but the allegations show there was a temporary closure of approximately two months and then safety restrictions after that. In the Tahoe Sierra case, the Supreme Court held that a property cannot be rendered valueless by a temporary restriction. So it's not a categorical denial. It can only be a possibly partial taking claim. And they have not also stated a proper partial taking claim or at least a violation of a clearly established right under that because the state was acting pursuant to its police power. And the Supreme Court has held on multiple occasions that when a state restricts the use of property for the purpose of the police power, and that means not criminal actions, it means protecting public safety or public health, then it's not a taking, it is not appropriation. The Supreme Court in Keystone Coal had restrictions on coal mining that were intended to protect the people who live nearby. And the court held that no property owner has the right to create a nuisance or to use their property in a way that could be injurious to others. And when a state restricts those types of uses, it's not taking anything from that owner because they didn't own it to begin with. They don't have that right. So it's not an unconstitutional taking. And the court has held this again and again. In the Mugler case, it was prohibited to manufacture alcohol, to manufacture liquor. Even though that plaintiff, he bought a brewery when it was legal, it became illegal to manufacture alcohol. And the Supreme Court held that was not a taking because it was for the purpose of protecting public health. This court held that an embassy realty when a property was demolished because it was a nuisance, that's not a taking because it's protecting public health and public safety. And these COVID orders were clearly intended to address public health. In the TJM64 case, the court held that COVID restaurant closures that were approximately 45 days were for the purpose of public health and therefore not a taking. And even if you find that police power is not fatal to the claim and you should apply Penn Central, under the Penn Central test, plaintiffs have also failed to state a claim and failed to allege a violation of a clearly established constitutional right. The test for that is to look at the economic effect on the property holder, the interference with their investment-based expectations, and the character of the action. And in that case, the court found that you more readily find a taking when it's in the nature of a physical invasion, not a public program adjusting benefits and burdens of economic life to promote common good. That is what was happening here. And several courts have held that these are quintessential examples of regulations that adjust those benefits and burdens and therefore are not a taking. And in fact, as far as I can see, every federal court that has applied Penn Central to these types of COVID closures and restrictions has found the claim to be without merit on the face of the complaint. And those are cited on page 45 of our brief. And a court of appeals has now weighed in on that. The Seventh Circuit, in the Nowlin case, which I filed as supplemental authority, also found that it would be futile for the plaintiffs to amend their complaint because it does not state a takings claim. You're saying that these various cases have all done it on a 12B6 ground. Correct. Or I think some of them might have been judged on the pleadings. What was the name of the Seventh Circuit case? Nowlin, N-O-W-L-I-N. Nowlin, okay. It just came out on May 20th. And so when you look at the duration, this was relatively short. It was a two-month period. There was no permanent closures. They haven't alleged that the closures caused them not to be able to reopen or diminish the value of their business long-term. And again, every court has found that on the base of the complaint these types of restrictions do not constitute a taking under Penn Central. And if you look at the character of the action, in TMJ-64 the court found that it weighs heavily in favor of the defendants. And you look at the character of that is, number one, it's temporary. It's a temporary loss of income. There's no indication that the fact that they closed down affected the value of their property, of their buildings, or of their business. This was not a physical taking. It's a restriction on use, and it was on particular types of uses. Other uses for their property were still permitted. It's in the nature of a nuisance. Well, I would be doubtful if during COVID one could turn a dance studio into something else. The only things that were allowed were the medical, the dental, the food and gas. So it's somewhat unlikely that they could turn it into something else. Perhaps. There were other businesses that started offering their services online. You can watch someone on an online video and teach dance classes. People came up with different ways to carry out their functions during COVID. But it's still the type of restriction that we're talking about here is not a taking where the government is taking it for its own use. They're restricting the use because it's found to be dangerous or injurious to public health. And it's that typical type of balancing where they're looking at the benefits and the risks to the public health when they decided which businesses to restrict. And it was intended to protect public health. And the Supreme Court has again and again upheld types of restrictions when they're for public health. These types of restrictions are most similar to the cases that the Supreme Court has upheld, such as Keystone and Mugler and Miller. The Miller case, a person was required to cut down their trees because they were diseased and it might transmit to other orchards that were nearby. In Keystone, it was coal restrictions that could harm people. In Mugler, it was the manufacture of liquor. And again, that was at the time appeared to be a permanent restriction. The entire business, that entire category of business was not allowed to occur anymore in that state. Obviously, that's changed now. But at the time, no one knew that that would be temporary. And the Supreme Court upheld that and said it was not a taking. So all these cases that have looked at this, they're not binding on you because they're district courts, but they all fall in line with that same theory that's woven through all these Supreme Court cases, that it's for public health, it's temporary, and it's a narrow restriction. And you held in the League of Independent Fitness Facilities cases that the state's interest in combating COVID-19 is at least equally significant to the interest of property owners. And even when you're acknowledging, and we acknowledge there is an economic impact on these plaintiffs, certainly, but looking at those factors, every court has found it to be not a violation of takings and certainly not when you look at qualified immunity and you're trying to find a clearly established constitutional right. Certainly, the state had no reason to think that it could not restrict property in this way when all these cases existed at the Supreme Court level saying they could take action, in addition to the Jacobson case. So the district court properly dismissed plaintiff's case. The plaintiffs failed to meet the most basic pleading requirements and asserted claims barred by the 11th Amendment and qualified immunity. And their claims are contradicted by established precedent. And I guess that's what I meant by saying their claims are contrary to law. They are not consistent with any of the existing precedent that exists. They have not stated a violation of a clearly established constitutional right. And we therefore ask you to affirm. Thank you. Rebuttal. Thank you, Your Honor. I'd like to note that one of the clients that we had that started this case had to drop off because he had to declare bankruptcy. So when we talk about the economic harms, they were quite real. He wasn't able to find a, I don't know, he wasn't an Internet guy. He just couldn't figure out how to do that stuff, I guess. But Jacobson, everybody loves talking about Jacobson, but Jacobson quite clearly, and I can read a quote from Jacobson. Before closing this opinion, we deem it appropriate to bring misapprehension of our views to observe, perhaps repeat a thought that may already sufficiently be expressed, namely the police power of a state, whether exercised by legislature or local body acting under its authority, may be exerted in such circumstances and regulations so arbitrary and oppressive, in particular cases, to justify the interference of the court. We believe this is that case. Further, Your Honor, when we look at the takings, we epically disagree with the characterization here. So first of all, with regards to temporary takings, Tahoe does allow temporary takings. In fact, the language in Tahoe specifies that it allows temporary takings. Now, in that case, they didn't allow it. We would argue that in that case, the reason it wasn't allowed is because it was speculative. Someone had bought property, it was just sitting there, and they thought they were going to be able to develop it, and they said, well, hold on, let's figure out what's going on. But in this case, we have an up-and-running dance studio. Investment-backed expectations is the question, and it's a very fact-heavy case, as laid out in numerous opinions. We know that the Penn Central case was very clear in Part 2 of the test that they expect a fact-finding. What about your opponent's point that all of these cases that she mentions decided on 12B6 grounds, so they didn't look into facts beyond what was in the complaint. Is that correct? Well, I think there's a very important two cases that I haven't seen cited. Now, I did not get a chance to fully review the case that was sent out this morning prior to our hearing. I just didn't get it until. But there's two cases. One is Midkiff v. Hawaii, or Hawaii v. Midkiff. And in that case, the Supreme Court states that police powers are coterminous with takings powers. That case seemed to evolve from another case, which I believe was cited in the case they sent out this morning, which is Pennsylvania Coal v. Mahan. And in that case, one of the important quotes is, as long recognized some values are enjoyed under implied limitation must yield to police power, but obviously the implied limitation must have its limits or the contract clause and due process clauses are gone. Your Honor, what we're saying here is if we don't have the opportunity, if people can't say the government's acting in bad faith, they're acting in bad faith. We're not saying that they made a mistake, that there was a rational basis. We're saying they acted in bad faith. We believe we can prove that. I'm sorry. It sounded like you just said you're not alleging that they're not being rational. Is that what you said? They are not being rational. Their behavior is both arbitrary and capricious, and that would be the standard that would negate rational. You're saying that even if rational basis is the standard, they would fail that. We believe. You don't need bad faith on top of that, do you? No, bad faith under the APA. This isn't an APA issue, but bad faith is thrown in like an APA. Right, it isn't an APA issue. But we're alleging that it was done in bad faith. The standard would be arbitrary and capricious. We are asking for an opportunity to show that. That will only come with discovery. That cannot happen prior to discovery because we need to know precisely what they knew and when they know it. We believe we know. We have evidence. I mean, the argument as you've just made would seem to apply to all of these rational basis 12B6 police power cases where the courts did rule without going into the details of it. One of the things, and I can't speak to every one of these cases. One of the things that I've noticed that is very common in this litigation is we as attorneys are very uncomfortable reading medical literature and looking at studies and working with some of these. I'm not asking you about your case. I'm asking about these precedents. Aren't these precedents? I'm saying in most cases they're not asking those questions. They're not challenging the facts in most of these cases. I don't know how many of them. The court said we're not going to go into the facts. Now, maybe the people didn't challenge them in those cases, but the precedents said we're not going to go into the accuracy if there is an argument, an arguable rational basis. If they presented a rational basis or even if the court can think of a rational basis that they haven't presented. Isn't that what those cases say? Maybe they're bad cases. I would argue that that's certainly not what they should say. And I would argue that the Supreme Court has indicated otherwise, like I said. They've indicated that where police power is coterminous with takings power, we certainly have to weigh in on a factual basis what's going on. The idea that we can't, Your Honor, it would be an absolute, to my mind, just a gross violation of the foundations of justice. I think it would invalidate the purpose of the court to suggest that there's no case in controversy over the largest, arguably the largest takings of case in the history of the country. Over a case where we can show that they shut down some, they didn't shut down others. And in their orders, they didn't give any basis for why they chose who to shut down. They didn't explain anything. They just said you're shut down, you're not. Well, what if they would have deemed lawyers nonessential? And, you know, the defense mentions, they mention dentists. My God, can you get closer proximity than that? No. That's far, I mean, I'm working in my mouth. That's exactly how, I mean. But there isn't an essential need. Well. People have a profound dental problem to get the attention of a dentist. Well, listen, Your Honor, that may or may not be the case. But there are a lot of First Amendment cases saying the importance of being able to express yourself under the First Amendment, which, by the way, is kind of a different area here. But they allowed protests. We had the George Floyd protests that were occurring quite, quite universally during COVID and during the lockdowns, which nobody tried to stop because it was a First Amendment. Dance studios are also First Amendment protected. I mean, you know, we can argue that, you know, maybe a dentist office is more important than a dance studio. But, you know, I don't know what legal basis there would be for that. I would argue that a dance studio has a First Amendment right. I don't see any for dental. But I can't argue that dental is important. But, you know, regardless, the immunity that's a. . . Did you argue a First Amendment argument in your complaint? We did not bring up the First Amendment in the complaint. In terms of the dance studios being protected. We only bring that up in response to what we've heard here. And I see your red light is on again. So you have used your time fully. Thank you. Thank you both for your argument. And the case will be submitted. The clerk may call the next case.